George MARTIN, Appellee,

v.

FLEISSNER GMBH, Appellant.

No. 83–1280.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 31, 1983.

Decided Aug. 13, 1984.

Rehearing and Rehearing En Banc
Denied Sept. 20, 1984.

Hoover C. Blanton, Columbia, S.C. (John R. Holland, Columbia, S.C. on brief), for appellant.

Charles E. Carpenter, Jr., Columbia, S.C. (F. Barron Grier, III, Richardson, Plowden, Grier & Howser, Columbia, S.C., Victor S. Sarratt, Gaffney, S.C., on brief) for appellee.

Before RUSSELL, WIDENER and SPROUSE, Circuit Judges.

WIDENER, Circuit Judge:

Fleissner GmbH, a German manufacturer of industrial equipment for the textile industry, appeals from a jury verdict in favor of appellee George Martin for injuries received while cleaning an allegedly improperly designed item of Fleissner equipment. We affirm the award of $400,-000 in actual damages; however, we reverse as to the award of punitive damages.

The accident which is the basis of this litigation involved an item of industrial equipment known as a "crimper." A crimper is one element of the "stretch line," a production line for synthetic fibers. The strands of fiber produced on this line, known as the "tow," pass through the crimper, which imparts a crimp in the fiber, giving it characteristics similar to those of natural fibers. The tow is channeled between two metal crimper rollers (the bottom one fixed, the upper under pneumatic pressure, both at 120–130° Fahrenheit) by an intake chute. The chute also operates as a guard while the crimper is running. When in place, the nip point, where the crimper rollers meet, is inaccessible. The rollers, which all but touch, are turned by electric drive motors. They pull the tow through, compress it, and push it into a "stuffer box" which causes the crimp. Abrasion over time necessitates the renewal of the surfaces of the rollers, which is generally performed by millwrights, who regrind the surfaces. Also, there is some slight adhesion of the chemical treatment on the fibers, and perhaps of the fibers themselves, to the rollers as the fibers run through. The material so adhering must be cleaned off, and it is the cleaning of the rollers which precipitated this case.

In 1972, Fleissner communicated with Hoechst Fibers Industries (Hoescht), plaintiff's employer, a polyester fiber manufacturer located in South Carolina, to offer to sell it a crimper. As a part of the sales negotiations, Fleissner provided a crimper to Hoechst for testing and evaluation, which was later returned, having been used for some months. The sales negotiations involved over 1-1/2 years of consultations between the parties, though Fleissner was not told any of the specifics of the chemical processes used in Hoechst's fiber manufacture (they were proprietary and closely guarded) beyond the functions a crimper in the projected tow line would have to perform. Fleissner personnel witnessed the Hoechst operation in the course of negotiation and design.

On November 23, 1973, Hoechst issued a purchase order to Fleissner for a crimper. By subsequent purchase order, Hoechst specified Reliance Electric as the supplier of the drive system for the stretch line, including the crimper, and requested the cooperation of the two companies to assure compatibility.

Fleissner, although it was to and did design the crimper, adapts its equipment to specific purchaser needs, so that there was consultation between Hoechst's engineering department and Fleissner on the accommodation of the crimper with the stretch line being built. However, the most significant change made through these consultations was the switch from a side-by-side arrangement of the dual crimper heads to a vertical one. Hoechst provided drawings of how it wished the heads arranged (one set several feet above and to one side of the other), which Fleissner used to make its drawings from which the crimper was ulti-

mately manufactured. This change did not implicate the basic design or specifications of the Fleissner crimper process. The drawings were approved by Hoechst June 5, 1974.

The crimper was shipped from Germany in December 1974 and arrived some time in January 1975. Its installation by Hoechst was inspected by Fleissner.

The appellant, George Martin, had been an employee at Hoechst from 1967, and had worked his way up to (A) operator by 1977. On November 13, 1977, the stretch line which included the Fleissner crimper developed an "overlength" problem. Upon inspection, Martin discovered the crimper rollers had developed a build-up of the chemical finish used on the fibers in the tow, which was causing the problem. Martin shut down the line, cut and removed the tow from the crimper, unscrewed and swung out the intake chute, and turned the machine on at low speed. He then held a piece of abrasive fabric against the upper roller to remove the build-up. Switching to his left hand, he moved to the lower roller. The fabric was caught by the crimper and, before he could react, his hand was pulled in between the rollers. The pressure, rotation, and temperature and the time lost while the crimper was opened to release his hand (25–30 minutes) did substantial damage to the hand, resulting ultimately in the amputation of most of it across the palm.

Build-up of the chemical finish was a common occurrence on the stretch line which incorporated the Fleissner crimper, requiring frequent cleaning by Hoechst personnel. Because of previous accidents during cleaning of the crimper, Hoechst employees had constructed paddles, covered with scotchbrite (an abrasive fabric) to do the job without endangering their hands. Martin, in a hurry to get the stretch line up again, did not use one.

Martin was unable to work at Hoechst for about nine months following the accident. He was hospitalized for a month, underwent six operations, and experienced considerable pain. He returned as an (A) operator in August 1978, though he was unable to perform all the functions that job required. In early 1981, he reported to work after he had been drinking, was sent home, and was subsequently terminated. He has been unable to find similar work because the loss of his hand has compromised his skills, and he is currently employed as a security guard, making less money and with fewer benefits than at Hoechst.

The case was tried to a jury which returned a verdict for $400,000 in actual damages and $100,000 in punitive damages, upon which judgment was entered.

This is a diversity case and is decided pursuant to the law of the state in which the tort occurred. *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Fleissner has raised several issues on appeal, which attack the sufficiency of the evidence to sustain the jury verdict and damages award, the applicability of South Carolina's strict liability statute, and the propriety of the award of punitive damages.

Martin introduced the testimony of two expert witnesses, Dr. Bradbury and Dr. Jur. Both were qualified by the court as experts in mechanical engineering and design. Dr. Bradbury is a professor of mechanical engineering at Clemson University, where his specialty is design, including safety design. In addition, he does consulting work for industry. Dr. Jur is an engineering consultant with extensive practical and academic experience, whose specialty is also design. While neither had direct experience with Fleissner crimpers, both testified they were familiar with the engineering principles underlying the operation of the rollers from their experience in other fields such as printing, papermaking, or sheet metal production. Both visited the Hoechst plant and observed the Fleissner crimper in operation, and, based on their knowledge and expertise, found the crimper to be poorly designed. Dr. Jur called it unreasonably dangerous, as did Dr. Bradbury. Dr. Jur went on to note that it did not appear that Fleissner had made any

provision at all for safe cleaning of the crimper.

Considerable controversy arose over the question whether Fleissner knew or should have known that the finish on the tow would accumulate on the rollers and would require the frequent cleaning which led to Martin's accident, and thus should have provided safe cleaning methods. The evidence is conflicting, as Fleissner claims it had no such knowledge and elicited from all of the expert witnesses the information that they did not know of another processor that needed in-process cleaning of crimper rollers. It was Fleissner's contention that the only time the protection of the intake chute would be removed, to its knowledge, was when the rollers were taken down for regrinding, and without knowledge of a build-up they could not design for it.

However, plaintiff introduced testimony showing the 1–1/2 year negotiations and the six month evaluation of a crimper, suggesting that Fleissner had ample opportunity to discover something about the Hoechst process, and noting that Hoechst had even provided a tray to catch runoff from the tow as it passed through the crimper. In addition, both Dr. Bradbury and Dr. Jur testified that, based on their knowledge of engineering and general familiarity with the processes involved in the manufacture of fibers, that heated rollers normally accumulate material. Dr. Bradbury found it inconceivable that the rollers would never need cleaning. Both agreed that safe cleaning methods could have been, but were not, provided.

Although Reliance Electric was selected to provide the electrical drive for the stretch line, Fleissner alone had overall design responsibility for the crimper and all its functions. Thus, it was responsible for the presence or lack of safety devices. Dr. Bradbury noted the design failed to satisfy OSHA regulations requiring an emergency cutoff or provision of proper cleaning tools.

Both Dr. Bradbury and Dr. Jur suggested several methods by which the design of the crimper could have been improved, including provision of a cleaning mode (whether by "inching" the rollers along or by widening the gap between the rollers during cleaning to remove the danger of entrapment), installation of an interlock to cut off the crimper when the operational guard (the intake chute) is removed, addition of a reverse gear, or a readily accessible panic button. All of these were considered rather standard safety mechanisms. No such safety mechanisms were designed into the crimper, and not even a simple warning was posted.

■ Fleissner argues that the two expert witnesses, from whom Martin obtained his most damaging evidence as to design defects were not qualified to testify about the crimper. We disagree. Opinion evidence of expert witnesses is admissible under Federal Rule of Evidence 702. *See Robbins v. Whelan*, 653 F.2d 47, 52 (1st Cir.1981), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 972, 71 L.Ed.2d 110 (1981) (qualification of experts in diversity actions controlled by Federal Rules of Evidence). The qualification of an expert witness is a question which lies within the sound discretion of the trial judge and will not be overturned in the absence of clear abuse. *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962).

■ Although, as the defendant has noted, neither witness was an expert on crimpers, both were knowledgeable in the pertinent areas of engineering design and familiar with the processes used by a crimper. This lack of direct experience is not a sufficient basis to reject their testimony, but may affect the weight that testimony is given, a decision properly made by the jury.[1]

■ Fleissner also challenges the charging of the jury on strict liability, arguing

---

**1.** The jury was, by the same token, free to assess the weight to be given to the testimony of the defendant's expert witness, Dr. Smith, who also

has a PhD in engineering and extensive experience with the crimping process.

that the order for the crimper in November 1973 is the sale referred to in the South Carolina strict liability statute,[2] and the prospective application of the statute bars its application to the crimper. *Hatfield v. Atlas Enterprises,* 274 S.C. 247, 262 S.E.2d 900, 901 (1980) (strict liability statute has prospective application only). The South Carolina Supreme Court has not decided the precise issue raised by the appellant, but its recent decision in *Schall v. Sturm, Ruger Co.,* 278 S.C. 646, 300 S.E.2d 735 (1983), we think, indicates how it would resolve the question. The court in *Schall* held that a post-act injury from a product purchased before the enactment of the strict liability statute was not remediable in strict liability. The critical moment for statutory coverage was when the product "enter[ed] ...the stream of commerce." *Id.* at 737. The court emphasized that strict liability does not turn upon a transaction, as does warranty, or upon injury, as does tort, but is "best analogized to a legal status: inchoate at the moment when the product leaves the seller's hands..." Accordingly, as to the machine involved in this case, strict liability attached sometime between the time the crimper left the manufacturer's hands in Germany, apparently in December 1974, and the time it was delivered and installed in South Carolina, early in 1975, both dates well after the July 9, 1974 effective date of the statute, and we are of opinion the statute covered the injury incurred in this case.

■ Fleissner has also argued lack of proximate cause, no breach of warranty, assumption of the risk, and lack of defect in the product. However, as we find that there was sufficient evidence of a defect in the crimper design to submit the allegations of negligence, breach of warranty, and strict liability to the jury, we will not disturb the jury's rejection of appellant's defenses.

■ Fleissner also challenges the award of $400,000 actual and $100,000 punitive damages. The award of actual damages we find not legally excessive, based upon the evidence of pain, suffering, disfigurement, medical expenses, and lost earning capacity in the record. Under South Carolina law, all of these elements are properly considered in determining recovery. *Oliver v. Blakeney,* 244 S.C. 565, 137 S.E.2d 772, 776 (1964); *Watson v. Wilkinson Trucking Co.,* 244 S.C. 217, 136 S.E.2d 286, 291 (1964). The amount of damages is peculiarly within the discretion of the jury and subject to correction by the trial court when it is convinced the award is over liberal, and by an appellate court only "...in those extreme cases in which the amount assessed is 'so shockingly excessive as manifestly to show that the jury was actuated by caprice, passion, or prejudice." *Hicks v. Herring,* 246 S.C. 429, 144 S.E.2d 151, 154 (1965). The evidence does not suggest such excess here. There was evidence of the present value of the difference between Martin's current income as a security guard and income as an operator over the balance of his expected life. Martin detailed his medical expenses of over $8000, and he, his wife, his physician, and a vocational expert discussed his loss of earning capacity, lost wages, lost fringe benefits, pain, suffering, physical impairment, disfigurement, and mental anguish. We find no basis for correction of the jury's award or a new trial on that account. The judgment for $400,000 in actual damages is affirmed.

■ The final issue we address is the challenge to the award of punitive damages. Fleissner argues that such damages are not available in strict liability and that the requisite recklessness and disregard

---

**2.** South Carolina's strict liability statute was effective July 9, 1974, and reads as follows in pertinent part:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property....

Code of Laws of South Carolina, 1976, § 15–73–10.

for consequences was not shown to justify the award in negligence or warranty. The South Carolina Supreme Court has not yet addressed the question whether punitive damages are available under the strict liability statute, and Fleissner makes a persuasive argument that, absent express language, the state courts will not read an authorization of punitive damages into the statute. We find it unnecessary, however, to predict the outcome of such a case in the South Carolina courts. The circumstances argued by Martin to justify the award by no means support it. On inspection of the record, we agree with the defendant that there has not been a showing of the willful, wanton, or malicious behavior necessary to justify the award of punitive damages, whether or not they are available. *Harris v. Burnside,* 261 S.C. 190, 199 S.E.2d 65, 68 (1973); *Fennell v. Littlejohn,* 240 S.C. 189, 125 S.E.2d 408, 413 (1962). The award of punitive damages is reversed.

The judgment of the district court is affirmed in all respects except the $100,000 amount of punitive damages which is reversed. The judgment of the district court should be modified accordingly.

AFFIRMED IN PART REVERSED IN PART and REMANDED.

Circuit Judge RUSSELL concurs in that part of the opinion setting aside the award of punitive damages. As to liability, however, he dissents. He is of opinion that the defendant was entitled to a directed verdict.