Elizabeth HOBAN, as Administratrix and Personal Representative of the Estate of James Patrick Hoban, Deceased, Plaintiff,

v.

GRUMMAN CORPORATION and Grumman Aerospace Corporation, Defendants.

Civ. A. No. 88–615–N.

United States District Court, E.D. Virginia, Norfolk Division.

July 12, 1989.

---

**7.** Defendant's alternative motion for a change of venue is mooted by the court's disposition of this matter.

**1130**

Bruce A. Blakeman, Robert M. Blakeman & Associates, Valley Stream, N.Y., and Jeff W. Rosen, Adler & Rosen, Norfolk, Va., for plaintiff.

Frank J. Chiarchiaro, Mendes and Mount, New York City, and Bruce T. Bishop and Randy D. Singer, Willcox & Savage, Norfolk, Va., for defendants.

## MEMORANDUM OPINION AND ORDER

CLARKE, District Judge.

This matter comes before the Court on the defendants' Motion for a Directed Verdict. For the reasons discussed below, the Motion is GRANTED.

### I. Background

The plaintiff, Elizabeth Hoban, is the widow of Lt. James P. Hoban, a Navy pilot. Lt. Hoban was killed on May 22, 1986 when the A–6E aircraft he was piloting crashed shortly after takeoff from the Naval Air Station (NAS) Oceana in Virginia Beach, Virginia.

The plaintiff, as administratrix of Lt. Hoban's estate, sued the manufacturers of the plane, the Grumman Corporation and Grumman Aerospace Corporation (hereinafter referred to in the singular as Grumman), proceeding on theories of negligent manufacture and breach of implied warranty.

Trial began before a jury on April 11, 1989. After approximately four and a half days of trial, the case was submitted to the jury on April 19. On April 24, the jury announced that it was unable to reach a verdict and was discharged. At that time, Grumman renewed its Motion for a directed verdict, which had previously been made and denied both at the close of the plaintiff's evidence and before the case was submitted to the jury. The transcript of the trial has been completed, the Motion has been fully briefed and the parties have agreed to waive oral argument. The Motion is, therefore, ripe for disposition.

The plaintiff alleges that the crash of the A–6E was due to an engine fire caused by a manufacturing defect in the plane's fuel system. The defendant denies the existence of a defect and asserts that, regardless of whether an engine fire occurred, the

sole cause of the accident was pilot error. Grumman also asserts the affirmative defenses of contributory negligence and assumption of the risk.

## II. Trial Evidence

A significant portion of the evidence in this case is contained in the Judge Advocate General's Manual Investigative Report [hereinafter "JAG Report"], which contains the results of the Navy's investigation into the crash. The JAG Report's factual findings are essentially undisputed, although the parties sharply disagree about the Report's opinions and conclusions.

On May 22, 1986, Lt. Hoban was assigned to fly an A–6E aircraft from NAS Oceana to NAS Cecil Field and ultimately to the aircraft carrier USS JOHN F. KENNEDY. The plane in question had been delivered to the Navy from Grumman's Calverton, New York factory on May 15, 1986, one week before the crash, and had logged approximately twelve and a half hours of flight time before the accident.

Before departure, Lt. Hoban was briefed on the flight and informed that the weather conditions mandated Instrument Flight Rules (IFR) procedures. JAG Report at 13. IFR departures at NAS Oceana require the pilot to "climb as rapidly as possible to 1,000 feet [and] then turn to conform with your departure procedure." Tr. 665. However, Lt. Hoban performed a "low transition" maneuver, climbing to no more than approximately 100 feet and remaining at this altitude nearly until the end of the runway. JAG Report at 14. The plane then made a sharp right turn and a rapid roll into a 60° to 80° angle of bank, reaching a maximum altitude of 300 to 500 feet. *Id.*

At some point before impact, the pilot reduced the aircraft's power from maximum power to idle. *Id.* Seconds before the crash, Lt. Hoban and the bombardier/navigator ejected from the plane. Due to the plane's sharp angle of bank—the plane's wings were described as being per-

pendicular to the ground at this point—the crewmen ejected into the ground; both were killed. The plane had been airborne for approximately a minute and a half when the crash occurred. Tr. 841.

The plaintiff presented testimony from two witnesses who described seeing flames at the rear of the plane before the crash. Tr. 81, 97. She also introduced statements contained in the JAG Report from two more witnesses who stated that they saw flames or fire at the rear of the plane. Tr. 337, 354. Other witnesses at trial or in statements to the Navy investigators stated that they heard the plane become silent or quieter shortly before the crash. Tr. 97–98, 120, 342, 343, 345, 352.

To prove the cause of the crash, the plaintiff offered as an expert witness Dr. Frederick Ryder, a "safety engineer" and self-described expert in accident reconstruction.[1] Dr. Ryder stated that, in his opinion, the crash was caused by a fire on the aircraft. Tr. 387. He testified that he based this conclusion on "the numerous statements of witnesses who saw fire coming out of the airplane." *Id.* He stated that the fire was caused "by a manufacturing defect which resulted in fuel leakage. The fuel leaked, ignited, burned in an uncontrollable manner, rather than in the normal controlled manner within the engine." *Id.* at 391.

Grumman introduced the testimony and written statements of several witnesses who affirmatively stated that they saw no smoke or flames on the plane before the crash. *See, e.g.,* Tr. 406, 408, 548, 633, 640, 650. Three of Grumman's witnesses reported that they heard no reduction in the plane's noise level before the crash. Tr. 567, 604, 616. All of the witnesses who mentioned it agreed that the aircraft was "clean," that is, with its landing gear up and its flaps and slats retracted. Tr. 537–38, 590, 612, 637.

Commander John T. Meister, the naval officer assigned to investigate the accident and prepare the JAG Report, testified on

---

**1.** As will be discussed more fully below, the Court expressed considerable doubt about Dr. Ryder's qualifications to testify as an expert in

this case but permitted him to testify in limited areas in order to fully develop the record. Tr. 324–35.

behalf of Grumman. Commander Meister's report included the witness statements, the engineering reports on the plane, weather information for the day of the crash, Oceana flight rules, the operations manual for the A-6E and other material. He also performed computerized simulations of the fatal flight. Tr. 659–662. Commander Meister concluded that the cause of the crash was pilot error. Tr. 692; JAG Report 24. Commander Meister's report and its conclusions were formally endorsed by seven officers in the Navy operational and administrative chains of command. JAG Report 26–36.

Commander Meister, a pilot who has logged more than 3000 hours of flight time in A-6 aircraft, testified that the crash occurred when the plane went into aerodynamic stall. Tr. 671. Aerodynamic stall is a normal physical phenomenon in which various combinations of the plane's air speed and configuration cause it to lose "lift" and descend. As both Dr. Ryder and Commander Meister explained, the wings of an airplane are designed so that, when the plane is moving, the air rushing past the wings exerts less pressure on the top of the wings than on the bottom, creating a net pressure upward, or lift. Tr. 376–77, 668. If the plane's speed drops below a certain point, the stall speed, there will be too little upward pressure under the wings and the plane will lose this lift and descend. *Id.* at 377.

The stall speed is the minimum speed at which an aircraft must fly in a given attitude or angle in order not to enter a stall. Tr. 670. The stall speed increases as the aircraft's nose rises, as its angle of bank increases and when the flaps and slats are retracted. Tr. 668–670. Commander Meister testified that stall training was an integral part of Lt. Hoban's training in A-6 aircraft. *Id.* at 723.

Commander Meister testified that, in his opinion, the aircraft's reduced power, sharp angle of bank and clean configuration resulted in a stall speed higher than the approximately 240 knots at which the plane was flying, resulting in a stall. Specifically, he testified, any angle of bank greater than 63° would cause a plane travelling at 240 knots to stall. Tr. 671. Because of the plane's low altitude, Lt. Hoban was unable to recover from the stall and the plane crashed. Tr. 722.

The engines and other components of the plane were examined by engineers at the Naval Air Rework Facility in Jacksonville, Florida. The engineering investigation found no evidence of pre-impact fire, Tr. 681, and determined that both engines were operating at 70 percent, or idle, power at the time of the crash. *Id.* The report also concluded that the warning lights that would indicate a fire or a problem with the fuel pressure were not lit. *Id.* at 685–86. The report concluded that the plane was fully functional and operable at the time of impact. Tr. 686.

Commander Meister also testified that the A-6E could fly with only one engine, being capable of climbing 1500 feet per minute on one engine with its wings level. Tr. 687. If the plane lost an engine while it was banking, the proper procedure would be to roll the wings level and gain altitude. Tr. 687–88.

Captain Robert Ferguson, a pilot with more than 2300 hours of A-6 flight time, also concluded that the cause of the crash was pilot error. Tr. 819. Captain Ferguson conducted additional simulations of Lt. Hoban's flight, both at full power and idle power. The simulator stalled and the low altitude resulted in a crash each time. Tr. 822. He agreed that a properly flown A-6 would be capable of flying on one engine and that the loss of the right engine would not cause the plane to bank to the right. Tr. 830–31.

An engineer from Pratt and Whitney, the manufacturer of the engine that Grumman incorporated into the plane, testified that he was present at the Navy's examination of the plane's parts after the crash. He concluded, as did the Navy engineers, that there was no abnormal fire in either engine. Tr. 882. The defendant also presented testimony from a test pilot at Grumman who explained the company's testing procedures and stated that he had flown the

plane in question three times without incident before its delivery to the Navy.

### III. Discussion

Under Rule 50(a) of the Federal Rules of Civil Procedure, the Court must direct a verdict if, under the applicable law, there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The question is not whether the evidence clearly favors one side or the other but "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512. As the Fourth Circuit has recently explained, a directed verdict is properly granted "where there is no substantial evidence in opposition and, without weighing the credibility of witnesses, there can be but one reasonable conclusion as to the verdict." *Poynter v. Ratcliff*, 874 F.2d 219 (4th Cir.1989).

In this case, due to the conflicting statements of the witnesses, the Court must assume for the purpose of this Motion that there was a fire on the aircraft before the crash. The questions remain whether the fire was caused by a manufacturing defect that was present when the plane left Grumman's control and whether the fire was the proximate cause of the crash.

 The only evidence in the case suggesting a manufacturing defect was the testimony of the plaintiff's engineering expert, Dr. Ryder. At trial, Grumman moved to strike Dr. Ryder's testimony on the grounds that he was not qualified to testify as an expert regarding aircraft engines or fuel systems. Although Dr. Ryder was allowed to testify in order to fully develop the record, the Court must agree that Dr. Ryder was not competent to testify as an

expert on the issues in this case and his testimony should be stricken.

Dr. Ryder, a licensed professional engineer, has degrees in electrical and mechanical engineering. Tr. 276. He stated that his only formal education in aerodynamics was as part of an undergraduate physics course. Tr. 277, 301. The bulk of his experience with aircraft concerned the design of aircraft control instrumentation, mainly fuel gauges. Tr. 283–88. This work, he stated, required him "to take into account completely the characteristics of ... jet aircraft in general." Tr. 286–87. Since 1975, Dr. Ryder has been a self-employed safety engineer and accident investigator and has investigated approximately eight aviation accidents. Tr. 289–90.

Dr. Ryder stated that he was familiar with the general principles of jet engines, Tr. 298–99, but that he has never performed any aerodynamic design work or engine design. Tr. 303–09. He had previously studied accidents that involved fires in airplane cabins, Tr. 299, and has testified in three cases involving aircraft. Tr. 310. These cases involved a stress factor in the structure of a helicopter, a cabin fire in an aircraft and a tire change on an aircraft. Tr. 310–11. Dr. Ryder has had no training or experience as a pilot. Tr. 312.

The A–6E's engine had been destroyed and was unavailable for study.[2] Tr. 483. However, Dr. Ryder failed to examine any of the other components of the aircraft that were available. Tr. 439, 503. For example, he did not examine the annunciator panel, which contained the fire warning light, the fuel pressure light and other indicators that were discussed in the Navy's engineering report. Tr. 452–54, 501–03. He stated that he thought the annunciator panel "was not important." Tr. 503.

Dr. Ryder failed to examine the engine or fuel system of any other A–6E or a similar aircraft. At no time did he testify that he was familiar with the design of the A–6 engine or fuel system that he claimed was defective.

---

**2.** The parties stipulated at trial that, after performing its engineering investigation, the Navy destroyed the plane's engine. Various other

components of the aircraft were retained and available to the plaintiff. Tr. 483.

At trial, the Court found that Dr. Ryder was not qualified to testify in the fields of either aerodynamics or jet engines and their fuel systems. Tr. 324, 327. For purposes of developing a full record, however, the Court allowed Dr. Ryder to testify but informed counsel that a plaintiff's verdict would likely be set aside. Tr. 324, 327. The jury was informed that Dr. Ryder would be permitted to testify in the fields of "jet propulsion and jet engines, and the fuel systems in connection therewith." Tr. 334. Although Dr. Ryder was permitted to testify, the Court never "ruled that Dr. Ryder was competent and qualified to testify," as the plaintiff's brief states. Plaintiff's Memorandum of Law at 29. The plaintiff asserts that the Court's findings concerning Dr. Ryder's lack of qualifications "were based upon misconceptions which were cleared up by plaintiff in oral argument." Plaintiff's Sur–Reply Memorandum at 2–3. This assertion is simply wrong.

■ The plaintiff is correct that an expert witness is not required to have direct experience with the precise device or machine alleged to be defective if the expert has knowledge in the area and is familiar with the general engineering principles involved. In support of this proposition, the plaintiff cites *Martin v. Fleissner GMBH*, 741 F.2d 61, 64 (4th Cir.1984). However, the two expert witnesses in *Martin* were specialists in mechanical engineering and machine design. *Id.* at 63. Although they had no prior direct experience with the textile crimper machine at issue, both were familiar with the general principles of the machine's rollers from experience in other, similar fields such as printing, papermaking and sheet metal production. *Id.* Further, both witnesses had visited the plant and seen the machine in operation. *Id.* Clearly, the general experience of the expert witnesses in *Martin* was considerably more relevant to the issues there than Dr. Ryder's experience is to this case.

The plaintiff also relies on *Garrett v. Desa Industries, Inc.*, 705 F.2d 721 (4th Cir.1983), which held that an expert need not have specific experience with the particular article involved. *Garrett* involved a stud driver that operated on the same principles as a handgun and used .22 caliber cartridges. The plaintiff's expert had a master's degree in mechanical engineering, was a licensed professional engineer and had been a naval gunnery officer responsible for small arms. He was familiar with the type of .22 cartridges the stud driver used and had examined the particular model at issue. Again, the expert's experience and knowledge, though indirect, were relevant to the item at issue.

In this case, Dr. Ryder had no education or direct experience with aerodynamics or jet engine design and no knowledge of the workings of the particular aircraft and its fuel system. Further, he possessed no indirect experience that related to the design of the allegedly defective fuel system. Dr. Ryder simply did not possess any "knowledge, skill, experience, training, or education" that would assist the jury in this case. Fed.R.Evid. 702. Accordingly, his testimony is entitled to no weight and should be stricken. *See Newman v. Hy–Way Heat Systs., Inc.*, 789 F.2d 269 (4th Cir.1986).

■ Even if Dr. Ryder were qualified as an expert, his testimony should be stricken as unsupported by the evidence. All of the scientific evidence from the Navy's engineering investigation indicated that there was no internal fire in the engines. The only evidence on which Dr. Ryder relied was the statements of witnesses who said they saw fire on the aircraft. He cited no evidence, scientific or otherwise, that the alleged fire occurred in the fuel system or that the fire was caused by a manufacturing defect. An expert's opinion must be based on the evidence; he may not "speculate in fashions unsupported by, and in this case indeed in contradiction of, the uncontroverted evidence in the case." *Newman v. Hy–Way Heat Systs., Inc.*, 789 F.2d at 270. *See also Nichols Constr. Corp. v. Cessna Aircraft Co.*, 808 F.2d 340 (5th Cir.1985) (upholding judgment n.o.v. for defendant airplane manufacturer where plaintiff's only evidence of causation was

"purely speculative" testimony of expert witness).

Furthermore, in his testimony about the alleged defect, Dr. Ryder made absolutely no explanation of how a manufacturing defect that could cause an engine fire could go unnoticed throughout the plane's testing and earlier flights and suddenly manifest itself during Lt. Hoban's takeoff. The evidence showed that the aircraft had been extensively tested, both on the ground and in the air, before Grumman transferred it to the Navy. Tr. 904–13, 964–70. There were six test flights at the Grumman factory, performed by both Grumman and Navy personnel. Tr. 913–14. The plane was also flown by Navy personnel from the New York factory to Virginia, for a total flight time of 12.3 hours. JAG Report 8. Dr. Ryder offered no explanation of how any alleged manufacturing defect that was present when the plane left Grumman's control could have caused an engine fire on this flight but not on the previous flights.

Finally, even if Dr. Ryder could be considered competent to testify about the existence and cause of a fire in the engine, he would not be qualified to testify that a fire was the sole proximate cause of the crash. In his own words, Dr. Ryder is not a pilot but an engineer. Tr. 312. Plaintiff's counsel admitted that Dr. Ryder was not qualified to state whether the loss of one engine would cause a twin-engine plane such as the A–6E to crash, nor to discuss the proper piloting procedures in the case of a fire. Tr. 319. Nonetheless, Dr. Ryder stated that, in his opinion, the crash was caused solely by a fire on the plane. Tr. 386–87. The two expert pilots testified that, if Lt. Hoban had flown to the correct altitude and followed proper procedures, a fire in one engine would not have caused the plane to crash. Dr. Ryder did not, and could not, dispute this evidence.

The plaintiff presented no other evidence of a defect in the aircraft besides Dr. Ryder's testimony. She failed to establish a defect in the aircraft or a causal nexus between any alleged defect and the crash. Even Dr. Ryder failed to state that a manufacturing defect in the fuel system was the only possible cause of the alleged fire, despite counsel's assertions to the contrary. Negligence claims "cannot be based solely on conjecture and speculation as to the abstract possibility that an alleged defect caused the aircraft to crash.... A jury is not permitted to speculate or guess as to the proximate cause of an accident." *Sievers v. Beechcraft Mfg. Co.*, 497 F.Supp. 197, 201 (E.D.La.1980).

The plaintiff argues that she has established a prima facie case proving a defect and that she should not be required to prove the specific location and cause of the defect. She cites two cases that are inapposite to the facts here. In *North American Aviation v. Hughes*, 247 F.2d 517 (9th Cir.1957), *cert. denied*, 355 U.S. 914, 78 S.Ct. 341, 2 L.Ed.2d 273 (1958), a case involving a military aircraft, the court found that there was "substantial evidence" that was "clearly indicative of mechanical failure, which the circumstances indicate is the fault of the manufacturer." *Id.* at 521. Such substantial evidence of a manufacturing defect of some type is simply not present in this case.

*Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631 (8th Cir.1972), also involved the death of a Navy pilot in an airplane crash. The plaintiff executrix was allowed to proceed on her theory of strict liability in tort without being required to prove the specific defect that caused the crash. The plaintiff showed that the aircraft was being used properly, that the maneuvers undertaken were within the performance capabilities of the aircraft and that fires had occurred and defects had been found in other aircraft manufactured by the defendant. The court held that the plaintiff would have a submissible case if she could "show that the crash was caused by some unspecified defect and that *no other cause is likely.*" *Id.* at 640 (emphasis added). In this case, there was substantial evidence of another likely cause of the crash, pilot error. The plaintiff also failed to rule out other conceivable causes of the crash such as faulty maintenance.

█ The plaintiff has failed to prove the existence of a defect in the aircraft or a

causal relationship between any alleged defect and the crash. Accordingly, the defendant is entitled to a directed verdict on both the negligence and breach of warranty counts.

■ Grumman also argues that, if it were found to be negligent, it would be entitled to a directed verdict because of Lt. Hoban's alleged contributory negligence and assumption of the risk. The Court finds these arguments persuasive.

In Virginia, a plaintiff's contributory negligence is a complete bar to recovery on a negligence claim. *See, e.g., Smith v. Virginia Elec. & Power Co.*, 204 Va. 128, 129 S.E. 655 (1963). In this case, the defendant produced substantial evidence of Lt. Hoban's negligence. Commander Meister in the JAG Report concluded that the sole cause of the mishap was pilot error. This conclusion was specifically endorsed by the Navy officers who reviewed and endorsed the Report. *See, e.g.,* JAG Report 26, 28, 32. Grumman's pilot witness, Captain Ferguson, also concluded that Lt. Hoban committed a series of errors that combined to cause the crash.

It is uncontroverted that Lt. Hoban failed to follow the IFR flight rules at Oceana, which require all aircraft to climb as rapidly as possible to 1,000 feet before making any turns. Tr. 665. Instead, Lt. Hoban performed a low transition maneuver, flying the length of the runway at an altitude of only 100 feet and climbing to no more than 300 to 500 feet during the final turn. Despite the plaintiff's attempts to suggest that low transition maneuvers were unauthorized but routine, witnesses for both sides agreed that Lt. Hoban's takeoff followed an abnormal flight pattern for an A–6 aircraft. Tr. 87, 104, 546, 592, 615, 631–32. Commander Meister testified that the maneuver violated NAS Oceana course rules. Tr. 788.

The evidence also showed that Lt. Hoban violated Navy procedures that would apply if there were a fire on the aircraft. The Navy's flight procedures are set out in the Naval Air Training and Operational Proce-

dural Standardization Flight Manual for the A–6E aircraft [hereinafter "NATOPS Manual"]. The NATOPS Manual for a particular aircraft was described as the "bible" for operating that plane. Tr. 661–62.

The plaintiff points out that, in the case of engine fire, one of the steps the NATOPS Manual requires is ejection. NATOPS Manual at p. 5–5. She suggests that the pilot's and bombardier/navigator's ejections indicate that the plane was on fire and that the pilot behaved properly. However, ejection is listed as the *tenth* recommended step in the case of engine fire. *Id.* at pp. 5–5 to 5–6. When the fire warning light is lit, the pilot should, among other things, place the engines on maximum thrust, jettison external stores, climb with the wings level, jettison wing and fuselage fuel and then shut down the affected engine. If fire indications are then positive after these steps are completed, the Manual requires ejection. *Id.* In case of a fire, the NATOPS Manual states, "[i]t is imperative that the pilot fly straight ahead, attempting no turns (terrain permitting) until reaching a safe altitude and air speed." *Id.* at p. 5–5. The Manual also instructs pilots that the A–6E's fire warning light is reliable. *Id.*

Commander Meister testified that, if Lt. Hoban had received a fire warning light during his takeoff, he violated the NATOPS emergency procedures. Tr. 791. He stated that the first thing the pilot should have done was to roll the wings level. *Id.* This procedure and the others previously mentioned are called boldfaced procedures because of their emphasis in the Manual; they must be memorized by the pilots. Tr. 792.

In this case, Lt. Hoban reduced the plane's power on both engines to 70 percent, rather than placing both engines at maximum thrust as required by the Manual. Tr. 792–96. He did not jettison the external stores, place the plane in a wings-level configuration or perform any of the first nine procedures called for in the Manual.[3] Tr. 793–99. Commander Meister

---

3. The plaintiff points out that the engineering

investigation found that the right speed drive

stated that all these procedures are to be done before the pilot determines if the fire indications are positive and ejects. Tr. 800.

Capt. Ferguson, the expert pilot witness, agreed that Lt. Hoban departed from proper procedures. Tr. 823. He stated that the aircraft's angle of bank was so extreme that it was technically considered acrobatic flight, which is prohibited in a controlled zone such as the Oceana runway. *Id.* He testified that the low transition violated both Oceana course rules and the squadron's standard operating procedures and that the flaps and slats were improperly retracted during the maneuver. Tr. 825.

Capt. Ferguson testified that the presence of a fire in one engine, either before or during the turn, would not change his opinion that *pilot error caused the accident.* Tr. 830–33. He stated that the plane was capable of flying on one engine and that the loss of the right engine would not cause a properly flown plane to bank right. Tr. 831. Capt. Ferguson testified that, if an engine fire occurs during a turn, the pilot should roll the plane level and continue upward flight with maximum thrust. Tr. 832–33. In the case of fire, he stated, ejection is proper only when the other procedures outlined in the NATOPS Manual are followed first and fire indications remain positive. Tr. 846.

Capt. Ferguson testified that a pilot's actions should be the same whether there is a fire warning light or some other positive indication of fire such as smoke. Tr. 844–45. He also stated that A–6 pilots receive extensive training in emergency procedures and aerodynamics. Tr. 834–36.

The plaintiff offered no evidence to contradict the *defendant's* evidence that Lt. Hoban violated course rules, NATOPS procedures and proper piloting standards.

Even if a fire occurred on the aircraft before the crash, the uncontroverted evidence shows that the pilot's errors at least contributed to, if not caused, the accident. The defendant would therefore be entitled to a directed verdict on the negligence count, based on Lt. Hoban's contributory negligence.

In Virginia, assumption of the risk is a defense to claims for both negligence and breach of implied warranty. *See Lust v. Clark Equip. Co.,* 792 F.2d 436, 439 (4th Cir.1986) (involving breach of warranty); *McDowall & Wood, Inc. v. Kilby,* 211 Va. 476, 478, 178 S.E.2d 497 (1971) (involving negligence). *Lust* involved a consumer who was injured when he attempted to repair a loader machine by inserting his hand between the frame of the loader and its lift cylinder. There was evidence that the plaintiff knew that the machine's lift arm could come down and injure him. *Lust,* 792 F.2d at 440. It was not necessary that the plaintiff have known that the lift arm was about to malfunction and in what manner, as long as he was aware that a possibility of malfunction existed and that he was subjecting himself to possible danger. Because the evidence about the plaintiff's knowledge of the risk was contradictory, the court held that the issue of assumption of the risk was one for the jury. *Id.*

In this case, the uncontradicted evidence showed that Lt. Hoban was aware of the potential of malfunctions and other emergencies that could occur in an aircraft but, by making a low transition, "placed his aircraft in a position which allowed him no margin for error." JAG Report 28 (endorsement of B.K. McDanel, Commander, Medium Attack Wing One, NAS Oceana). Given his extensive training in emergency procedures, Lt. Hoban was certainly aware

---

switch and the right engine fuel master switch were in the off position. JAG Report 17. She argues that this is conclusive proof that Lt. Hoban shut down the engine and, therefore, that the engine was on fire. Commander Meister testified that the position of the switches is contradicted by other, strong evidence that both engines were operating at 70 percent power at the time of impact. Tr. 764. Although he described these findings as anomalous, *id.* at 765,

he concluded in his report that the switches positions were likely caused by the impact. This view is confirmed by the fact that there was no evidence that Lt. Hoban jettisoned his external stores, shut off the bleed air isolation valves or performed any of the six NATOPS-prescribed procedures that are to be followed before an engine is to be shut down. *See* NATOPS Manual at pp. 5–5 to 5–6.

of the risk that some type of malfunction or other problem could occur in the aircraft. However, he undertook a maneuver that left him no room to properly respond to any potential malfunction. Moreover, Lt. Hoban had previously been disciplined for making a low transition during his training at NAS Pensacola and was certainly on notice of the dangers of such a maneuver. Tr. 680; JAG Report 23.

As in the *Lust* case, there is evidence that Lt. Hoban knew of the possibility of a malfunction and placed himself in a position that subjected him to the risk of harm associated with a malfunction. Unlike *Lust*, however, the defendant's evidence that Lt. Hoban assumed the risk is uncontroverted, and no jury question exists. Assumption of the risk is a bar to recovery on claims of both negligence and breach of warranty, even if a defect is proved. Accordingly, the defendant is entitled to a directed verdict on this basis as well.

### IV. Conclusion

For the reasons discussed above, the defendant's Motion for a Directed Verdict is GRANTED, and this case is DISMISSED.

IT IS SO ORDERED.