**Richard DIVIERO, a single man, and Kay Heminger, a single woman, Plaintiffs,**

v.

**UNIROYAL GOODRICH TIRE COMPANY, a foreign corporation, Defendant.**

**No. Civ 92–1151 PHX ROS.**

United States District Court, D. Arizona.

April 4, 1996.

Theodore Joseph Segal, Phoenix, AZ, for plaintiffs.

Michael Lloyd McAllister, Nedra Jane Bates, Michael L. McAllister, Ltd., Phoenix, AZ, for defendant.

## AMENDED ORDER

SILVER, District Judge.

Plaintiffs filed an action in State Court alleging that Defendant had manufactured a defective and unreasonably dangerous tire which caused an accident in which they incurred personal injuries. The matter was removed to Federal Court.

In May of 1995 Defendant moved in Limine to exclude Plaintiffs' proffered tire ex-

pert, Mr. Loren John Forney, and requested a Federal Rule of Evidence 104(a) hearing. Concurrently, Defendant filed a Motion for Summary Judgment. A hearing was held on January 22, 1996 and the Court granted the Motion to Exclude Mr. Forney. Plaintiffs' counsel conceded that without Mr. Forney's testimony Plaintiffs would not succeed in meeting their burden at trial. Thus, summary judgment in favor of the Defendant was appropriate and was granted.

These are the Findings of Fact and Conclusions of Law in support of the Court's rulings.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. General Legal Principles

The Supreme Court of the United States in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) set forth the guideposts for determining the admissibility of expert testimony. Of central significance was the Court's recognition both of the Federal Rules' "liberal thrust" with regard to the admissibility of expert testimony and the trial judge's "gate keeping" role vis-a-vis expert proof on scientific issues. *Id.* at ——, 113 S.Ct. at 2798–99. The Supreme Court stressed that in the usual case the evaluation of expert testimony must be left to the jury but emphasized the trial court's important responsibility, pursuant to Rule 104(a) of the Federal Rules of Evidence, to screen scientific evidence in order to keep unreliable evidence out of the courtroom. *Id.* at ——, 113 S.Ct. at 2796. The Court made clear that a District Court's expert witness function is a two step inquiry embodied in Federal Rule of Evidence 702 which is:

1. To determine whether the expert has minimal educational experiential qualifications in a field that is relevant to a subject which will assist the trier of fact.

2. If the expert passes this threshold test the court should further compare the expert's area of expertise with the particular opinion the expert seeks to offer. Here the expert should be permitted to testify only if the expert's particular expertise however acquired enables the expert to give an opinion that is capable of assisting the trier of fact.

*See Thomas v. Newton Int'l. Enterprises*, 42 F.3d 1266, 1269 (9th Cir.1994); *Carroll v. Otis Elevator*, 896 F.2d 210, 214–15 (7th Cir. 1990); *Kloepfer v. Honda Motor Co.*, 898 F.2d 1452, 1458–59 (10th Cir.1990).

### B. Qualifications of the Expert

■ The Advisory Committee Notes to Rule 702 state that Rule 702 is "broadly phrased and intended to embrace more than a narrow definition of a qualified expert." It has been held, however, that a court may exclude an expert who does not have the appropriate experience, education or training to offer a helpful opinion with regard to controverted issues. In *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1317–18 (9th Cir.1995) (Daubert II) the Ninth Circuit Stated:

Rule 702's helpfulness standard requires a *valid scientific connection* to the pertinent inquiry as a precondition to admissibility.

(emphasis added) *See, e.g., Hughes v. Hemingway Transp., Inc.*, 539 F.Supp. 130, 133 (E.D.Pa.1982) (exclusion of witness' opinion testimony was proper because the deposition revealed that the witness could not calculate the coefficient of friction on the roadway at the time of the accident and, therefore, could not determine whether the driver of a tractor/trailer was using the proper technique for coping with a skid during icy conditions); *Kloepfer v. Honda Motor Co.*, 898 F.2d 1452, 1458–59 (10th Cir.1990) (District Court properly excluded the testimony of a pediatrician who was experienced as a children's accident preventionist. The lawsuit involved the death of a child while a passenger on an all-terrain vehicle manufactured by the defendant. The excluded testimony, however, related to the conduct of the adult driver and had no bearing on the behavior of the child passenger).

Indeed some issues clearly require expertise in a particular field. For example, in *Edmonds v. Illinois Central Gulf Railroad,*

910 F.2d 1284, 1287 (5th Cir.1990) it was held to be err to permit a clinical psychologist to testify that stress worsened the plaintiff's preexisting heart condition because causation of a heart condition is a medical issue. Likewise, in *Stull v. Fuqua Industries, Inc.*, 906 F.2d 1271 (8th Cir.1990) a mechanical engineer was found unqualified to state that the plaintiff's leg would have broken had the accident occurred in the manner claimed by the plaintiff because the expert lacked the requisite expertise in human anatomy.

### C. *Mr. Forney is not a Qualified Expert*

Mr. James Gardner of Bridgestone/Firestone Tire Company, a mechanical engineer with a master's degree in mathematics, testified for the Defendant. He has been engaged for many years in development research, design and the manufacture of steel belted radial tires. He has also been involved in control group testing, failed tire analysis and special testing over the years. He has 11 patents in tire technology and has published many articles. Presently, his primary responsibility is the analysis of failed tires. Mr. Gardner established that scientific knowledge and a scientific methodology are essential in tire failure examination of the steel belted radial tires involved in this accident, whether learned through experience or academically. He made clear, however, that steel belted radial tires are unique and complex and the experience and knowledge must have some valid connection with these tires. He explained that it is important to have worked in a plant with engineers and chemists involved in control testing of steel belted radial tires. He stated:

> Well, you have to know what the components are, how they're put together, and what they're supposed to be doing, in order to determine how they came apart. If you don't know what they are and what they're doing, it's relatively impossible to tell why they came apart.

(Trans. at 68)

He further explained that for proper testing of steel belted radial tires you must have "an understanding of what's there and what's supposed to be there." (Trans. at 85)

Finally, Mr. Gardner said that it is standard in the tire industry that one must have expertise which relates to the particular tire for the tire failure analysis. "Preferably, [one] will have at one point worked for somebody that manufactured those tires, or taken formal education in that area, or done testing of your own ... or been part of some testing that was done by someone who was testing." (Trans. at 94) When asked on cross-examination whether one would need to know the chemistry he stated that it depended on the conclusion "[if] the conclusion is there's some defect in it, I think you certainly ought to know a little bit about it." (Trans. at 94)

■ Mr. Forney is an engineer. In essence, his qualifications consist of his experience working with tires since 1960, his examination of numerous tire failures and his position as President of a tire consulting service company since 1971. He readily admits that he has never been engaged by a manufacturer of steel belted radial tires. (Trans. at 7) He never conducted controlled testing of steel belted radial tires in a plant setting when he worked for a tire manufacturer. (Trans. at 13) He worked in a plant on bias belted and not steel belted radial tires. (Trans. at 7) When asked whether the two types of tires differed significantly he stated "absolutely." (Trans. at 7) He also readily admitted that because he was not a chemist he was not aware of "the right compatibility of steel to rubber interface with steel belted radial tires." (Trans. at 16) In particular he was asked and he responded as follows:

Q. So what you're telling us, then, is that the system, the design system for the steel to rubber interface on a steel belted radial tire, you don't know the mechanical, chemical, or thermal components that go into that process, is that right, sir?

A. I am not familiar with that end of the business. I'm not a chemist, I don't know that.

Q. Nevertheless, you have come to court, not knowing that process, and I said mechanical, chemical, and thermal, not knowing that process, you claim that there's an adhesion defect in this tire?

A. When I have a tire that has separated, I have a breakdown in the adhesion, there's no question about it.

Q. Okay. Let's be clear about it, though. You've never been involved, for any manufacturer, in working with the people who develop the adhesion system for tires, correct?

A. Well, that is true. We've said that before, yes.

Q. Well, we're saying it now.

And you've never been involved in understanding or implementing or working with people who develop the formulas for the adhering of the steel to rubber system, true?

A. Well, that's true. That's true.

(Trans. at 7)

Mr. Forney concluded that there was a defect and it was due to an adhesion problem in the skim coat but he never worked with a chemist who developed the skim coat for steel belted radials. He was asked and he responded as follows:

Q. Okay. Skim coat for steel belted radial tires is a very intricate, very complex chemical process, isn't it, sir?

A. I'm certainly sure that it is, yes, sir.

Q. And it's not really technical. It requires the scientific involvement of polymer chemists, engineers, mathematicians, people who are familiar with materials, chemistry, polymer strands, all of those kinds of things?

A. That is absolutely true. *And it's so complex that just the slightest deviation from this mixture and you have a problem.*

(emphasis added) (Trans. at 20–21)

Throughout his testimony Mr. Forney demonstrated that he had very little knowledge, understanding or experience of the manufacture, components or chemical makeup of steel belted radial tires.

Mr. Gold also testified at the hearing. He has had 26 years experience with tire companies as a tire engineer with significant background in the development of steel belted radial tires, failed tire testing, tearability of rubber and independent research.

Neither Mr. Gardner or Mr. Gold believed that Mr. Forney was qualified to render opinions about *steel belted radial tires.* Mr. Gardner stated:

A Based on the testimony I have heard this morning [Mr. Forney's testimony] and the questions that were posed to him I would say [that Mr. Forney was not sufficiently qualified as an expert].

Q And that's because—

A That's because he never worked around steel belted radial tires.

Q And you believe that it's standard understood in the entire industry, that you must have the expertise which relates to the particular tire, in this case, steel belted, because they're so different than bias belted tires?

A Yes, I believe that's true.

(Trans. at 88–89)

When Mr. Gold was asked whether Mr. Forney was qualified to render expert opinions he stated, "I don't think he did enough work on this tire to render an opinion." (Trans. at 88–89)

█ It is clear from the testimony presented at the hearing that understanding the nature of steel belted radial tires is a complex scientific process, and that Mr. Forney does not possess the training or expertise to render a valid scientific opinion concerning whether these tires are defective. An expert's experience is given significant weight in determining the witness' qualifications as an expert if only technical knowledge is required. If, however, scientific knowledge is necessary the expertise must be coextensive with the particular scientific discipline. *Thomas,* 42 F.3d at 1269–70 and Fnt. 3; *Claar v. Burlington Northern Railroad Co.,* 29 F.3d 499, 502 (9th Cir.1994). Expertise in the technology of fruit is not sufficient when analyzing the science of apples. Courts have excluded the testimony of engineers because their expertise was not particular to the science involved in the case. Mr. Forney's expertise and experience do not "fit" the facts of this case. *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2796. *See Perkins v. Volkswagen of America, Inc.,* 596 F.2d

681, 682 (5th Cir.1979) where a specialist in mechanical engineering with no experience in designing entire automobiles was properly permitted to express opinions on general mechanical engineering principles, but he was prohibited from testifying as an expert in automotive design. Also in *Hoban v. Grumman Corp.,* 717 F.Supp. 1129, 1133–34 (E.D.Va.1989) a licensed professional engineer was not permitted to testify as an expert regarding aircraft engines or fuel systems where his only formal education in aerodynamics was as an undergraduate and he had never worked in the field.

### D. *The Scientific Methodology of an Expert*

■ The Supreme Court wrote in *Daubert:*

In order to qualify as "scientific knowledge" an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known. In short the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert,* 509 U.S. at ——, 113 S.Ct. at 2795. The Court went on to explain that in order to determine whether the expert's proffered testimony pertains to "scientific knowledge" the trial judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at ——, 113 S.Ct. at 2796. The Court stressed that "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at ——, 113 S.Ct. at 2797. A list of illustrative factors that bear on the judge's inquiry was provided, and are:

Falsifiability (whether the theory or technique can be, and has been, tested).

Peer review and publication.

The known or potential rate of error and the existence and maintenance of standards controlling the technique's operation.

General acceptance of methodology in the scientific community.

*Id.* at —— – ——, 113 S.Ct. at 2796–97; *United States v. Jones,* 24 F.3d 1177, 1179 (9th Cir.1993); *Claar v. Burlington Northern Railroad Company,* 29 F.3d 499, 501 (9th Cir.1994).

### E. *Mr. Forney's Methodology is not Scientifically Valid*

■ Mr. Forney opined in his deposition and at the hearing that the tire in the instant case was defective. His espoused opinions are as follows:

1. In his deposition he stated:

I'm suggesting that there's something in error in the manufacture of this tire that allowed this—these two belts to separate like this.

When asked what it was, Mr. Forney stated: "Well, I don't know what it is. That's always the big question."

When asked again by Uniroyal's counsel what was the defect in this tire, Mr. Forney responded:

"The failure of the belts to maintain their adhesion and stay together."

(Forney Deposition at 84–85)

2. At the hearing Mr. Forney again claimed that there was an adhesion defect and under questioning testified as follows:

Q What is the defect in the adhesion system with respect to this tire, sir?

A The breakdown of the adhesion between the belts.

Q That's an observation, sir? We know that the belts have come apart, the tire is apart. What caused the belts to come apart?

A *I don't know.* And that's exactly what it is—in the deposition from the expert from Goodyear. He did not know either. But he had tires that come back that had failures in service and he—and I asked him why this happened. He said "Well, tires are manufactured by men by people—"

(emphasis added) (Trans. at 54)

3. At the hearing he stated when "I have a tire that has separated, I have a breakdown in the adhesion, there is no question about it." (Trans. at 28)

4. At the hearing when asked whether he believed the tire failed from some problem with adhesion in the skim coat or between the rubber and steel, he stated,

"It was either that or the skim coat between the two belts. In this case I think it was the skim coat between the two belts. Had nothing to do with the wire at all."

(Trans. at 19–20)

5. At the hearing when asked about the chemical process that causes the belts to separate, he stated,

"Mr. McAllister, when I have a tire that fails, that belts come apart, and I haven't got any reason, any reason whatsoever why this should happen, I have a tire that's failed. Apparently the adhesion between the belts has failed. There isn't anything else to determine."

(Trans. at 28)

6. When asked why he thought the skim coat had failed he stated,

"I'm not a chemist. I don't know what it is. I don't know how many times I have to tell you, I'm not a chemist and I can't answer these questions. All I know is that the tires that they were producing out there in the field and they're failing in great numbers, in some cases great numbers."

(Trans. at 36)

7. At the hearing Mr. Forney stated to the Court that there could have been a variety of causes that he could have considered but he did not have information such as where "this tire came from." Then incongruously when asked by Defense Counsel why he stated in his report that the only cause was a manufacturing defect when there could have been many other causes he responded:

It's the only cause—the only cause that I considered valid in the scientific methodology analysis of this particular tire.

(Trans. at 128)

Although the methodology used by Mr. Forney to reach these opinions is not entirely clear it appears to be based upon his experience in examining numerous tires. He told the Court that when he receives a tire he inspects it externally and internally, taking photographs, and he completes this process by having looked at "millions—or not millions, many, many tires over my career. The experience that you have is always working, is always with you." (Trans. at 149) His methodology does not include review of independent publications, peer review articles or independent testing and validation. (Trans. at 110–111)

When asked whether he had the expertise to explain the "mechanical, chemical or thermal process" involved in adhesion defects he merely responded that when he finds a tire separation "[he has] a breakdown in the adhesion, there's no question about it." When asked whether or not he has conducted any independent tests or control group tests to determine whether the culprit was in the skim coat he stated, "I haven't done any of this. I'm not a chemist. I'm not involved with this kind of thing." (Trans. at 28) He attempted to retrospectively support his conclusion by Uniroyal customer complaints that have no scientific verification or accountability. (Trans. at 41–42) When asked whether his methodology has been accepted he stated, "I don't know. I've used the same methodology that everyone else uses." (Trans. at 148) He continued, "I don't know that anyone has ever said to me personally that your methodology is okay or accepted or whatever, but I use the same procedures exactly, same equipment." (Trans. at 148)

Nowhere in his testimony were his procedures explained except in the nature of his experience. Again, when asked what was the basis of his conclusion that there was an adhesive failure or defect, he stated,

"Based on about—I've been in this business for 42 years, and all the testing that I've done, I ran two test centers, and all of this is based on experience."

(Trans. at 199–200)

Finally, when asked about his method of reporting and his note taking system and in particular whether his was similar to others in the industry, he stated, "I don't know of anyone that does it in that respect." (Trans. at 200)

According to Mr. Gardner the major flaw in Mr. Forney's methodology was the fact

that he did not eliminate other causes for the failure of the tire. Mr. Gardner stated:

—if you're going to use the process of elimination, you have to eliminate everything. And he didn't eliminate certain factors.

For example, he didn't eliminate exposure to something that would cause tread cracking, or a cut that extended into the belt, because he didn't have that tread and outer belt. So he couldn't eliminate that. He didn't eliminate a heat history of the tire in storage. That's what's wrong with the methodology.

I think, and I didn't look at the tire, but based on what the notes were, I think that some things that he eliminated shouldn't have been eliminated. But that's another issue, whether he's right or wrong about those.

The methodology is that he didn't identify the defect, and couldn't eliminate all possibilities, but still concluded, by process of elimination, that it had to be a manufacturing defect.

(Trans. at 87)

On cross examination he continued:

Anybody can speculate and say, "Well, I don't know why it came off. Must have been defective."

To me, that's not enough. You have to—if you can't affirmatively determine it and you can't eliminate it, do it by process of elimination, there are certain mechanical things that happen in the world that just ultimately go as unknowns.

(Trans. at 100)

Finally, in the opinion of Mr. Gardner, Mr. Forney did not rely on any theory or opinion that had been tested and it had no peer review scrutiny. (Trans. at 110) Mr. Gold found his methodology deficient because his analysis could not be replicated and there was no connection between his notes and his report. (Trans. at 173) Mr. Gold also believed that there were many possibilities causing the tire to fail which were not eliminated. (Trans. at 173)

Mr. Forney was hired as the expert witness in another case within the District of Arizona titled *Arredondo v. Uniroyal Good-*

*rich Tire Company.* The Court granted the Motion in Limine excluding Mr. Forney's testimony stating:

Even crediting Mr. Forney with his years of technical experience, his assertions are conclusory and remain unreliable. In sum, Mr. Forney asserts that the tire had a defect because the belts separated (citation omitted). Mr. Forney is unable to suggest, however, what specifically in the manufacturing or design process caused the belts to separate.

Concomitantly, in the instant case Mr. Forney's opinions are predictions and unsubstantiated opinions without the incorporation of valid scientific authority. In essence he examined the tire, found the belt separated and then appeared to leap to the conclusion that it was defective. He offered no reasonable explanation why he concluded that there was a defect, just that because of his vast experience with examining tires it must be defective because he has no other explanation for the separation. This does not meet the mark under Rule 702. *See DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 944 (3rd Cir.1990) (the Court excluded the testimony because the purported methodology was so unreliable it warranted exclusion).

The Court concludes that the helpfulness standard incorporated in Rule 702 has not been met by Mr. Forney's proposed expert testimony.

*Motion for Summary Judgment Should be Granted*

The exclusion of Mr. Forney's testimony is critical, leaving the Plaintiffs unable to prove the essential elements of their case. This mandates the granting of summary judgment. What is more, Mr. Forney's expert testimony is so speculative and conclusory that it fails to raise a genuine issue of material fact. As the Supreme Court stated in *Daubert:*

Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct judgment,

Fed.Rule Civ.Proc. 50(a), and likewise to grant summary judgment, Fed.Rule Civ. Proc. 56.

*Daubert,* 509 U.S. at ——, 113 S.Ct. at 2798 (1993).

Here the Defendant has succeeded in establishing the absence of a triable issue of fact.

The distinction between admissibility and sufficiency, though perhaps often blurred in the past by courts when handling issues relating to scientific evidence has been clearly reaffirmed in *Daubert. See Maffei v. Northern Ins. Co.,* 12 F.3d 892, 897–900 (9th Cir. 1993) (expert evidence was admissible but failed to be sufficient to raise a triable issue).

Accordingly,

**IT IS HEREBY ORDERED** granting Defendant's Motion for Judgment as a Matter of Law and Defendant's Renewal of its Motion for Summary Judgment.