Linda N. VOOHRIES–LARSON, surviving mother of Torrance Justin Voohries; Betsy Keilen, surviving mother of Brad Keilen; and Charlene Townsend, surviving mother of Ronald Sean Townsend, Plaintiffs,

v.

THE CESSNA AIRCRAFT COMPANY, Defendant.

CIV–95–2574–PHX–ROS.

United States District Court, D. Arizona.

Jan. 20, 1998.

Warren R. Brown, Phoenix, AZ, Steven K. Larson, Law Offices of Steven K. Larson, Tempe, AZ, for Plaintiffs.

Michael Lee Parrish, Morrison & Hecker, Phoenix, AZ, Ronald Paul Williams, John Curtis Nettels, Jr, Morrison & Hecker, Wichita, KS, for Defendant.

## ORDER

SILVER, District Judge.

Pending before the Court are (1) Defendant's Motion to Exclude Plaintiffs' Experts, and (2) Defendant's Motion to Exclude Plaintiffs' Mock-up of T303 Wing.

### I. BACKGROUND

On July 4, 1993, at about 3:20 a.m., a Cessna T303 airplane crashed into the ground near Ernest A. Love Field in Prescott, Arizona. All five persons aboard were killed. Plaintiffs, who are the surviving mothers of three of the deceased, commenced this wrongful death action in the Superior Court for Maricopa County on July 5, 1995. In their Complaint, Plaintiffs allege the airplane's fuel system, manufactured and designed by Defendant Cessna Aircraft Co. ("Cessna"), was defectively designed and unreasonably dangerous. Plaintiffs filed an Amended Complaint on October 2, 1995. On November 21, 1995, Defendant removed the action to this Court on the basis of diversity of citizenship. On December 1, 1997, Defendant filed the instant motions. On December 22, 1997, Plaintiffs filed Responses in opposition.

### II. LEGAL STANDARD

■ Rule 702 of the Federal Rules of Evidence provides,

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In this case, the qualifications of the proposed expert witnesses are not disputed. Rather, Defendant argues that the testimony of Plaintiffs' experts lacks sufficient support to be of help to the trier of fact. This argument requires the Court to perform its "gatekeeping function" of ascertaining whether the testimony "rests on a reliable foundation and is relevant to the facts of the case." *McKendall v. Crown Control Corp.*,

122 F.3d 803, 805 (9th Cir.1997) (quoting *Bogosian v. Mercedes–Benz of North America, Inc.*, 104 F.3d 472, 476 (1st Cir.1997)).

Defendant offers two primary arguments against admission of the testimony. First, it contends that the experts are not able to establish that the alleged defect is the proximate cause of the crash. Second, it argues that the opinions of the experts are factually unsupported. To take the last argument first, the Court will first consider the factual underpinnings of Plaintiffs' experts' opinions. Next, the Court will consider Defendant's argument relating to causation.

### III. FACTUAL SUPPORT

Defendant's motion seeks the exclusion of three of Plaintiff's experts: David Hall, a design engineer, Jeurgen Janzik, a pilot expert, and Kenneth Orloff, an expert on the plane's flight path. These experts intend to testify in support of Plaintiffs' theory of the crash, which is as follows: (1) soon after take-off, the aircraft entered into an uncoordinated left turn [1]; (2) due to design defects in the fuel system, fuel flowed outward during this uncoordinated turn, allowing air into the float valves; (3) the introduction of air caused the fuel system to malfunction; (4) the pilot shut down the left engine once the malfunction occurred; and (5) this failure caused the aircraft to enter a "flat spin," from which the aircraft was unable to escape. None of these experts is able to offer opinions supporting each step of this theory, but Plaintiffs argue that opinions of all three experts, taken together, provide support for their theory. Defendant argues that the opinions, whether taken individually or together, provide no such support.

1. A turn is uncoordinated when the bank angle is not properly coordinated to the arc of the turn and the gravitational vector is no longer along the vertical centerline of the airplane. In this situation, fuel in the wing tanks would tend to be forced inboard or outboard. (Def. Mot. re T303 Wing at 11.)

2. At oral argument, Plaintiffs' counsel explained that a pilot "feathers" a propeller by adjusting the "pitch angle" of the blades so that "the least amount of mass is exposed to the forward motion

### A. David Hall

Hall intends to offer the following opinions at trial: (1) both engines showed no signs of power at impact and the left propeller was probably "feathered;"[2] (2) the fuel system design is defective and unreasonably dangerous in a number of ways; (3) the left engine lost power and was shut down by the pilot while in a traffic pattern, probably from ingestion of air while in an uncoordinated turn; and (4) the accident was caused by the defective fuel design of the fuel system, which allowed the fuel to flow to the outboard end of the tank during an uncoordinated turn, resulting in failure of the left engine and a significant lateral load imbalance. (Mot. at 8–10.)

Hall's first three opinions are inextricably linked. From the plane wreckage, Hall concludes that the left propeller was "feathered," that is, the blades were positioned such that it produced no forward thrust. He also notes that the National Transportation Safety Board ("NTSB") found no sign of engine failure. From these facts, he concludes that the pilot shut down the engine.[3] Hall further concludes that the pilot would not have shut down the engine unless it had malfunctioned, and that the probable cause of the malfunction was fuel starvation. According to Hall, this sort of malfunction occurs when the plane enters an uncoordinated left turn. Hall's fourth and concluding opinion is that this series of events was the cause of the crash.

### 1. The Left Propeller was in the "Feathered" Position.

■ Hall's first opinion is that both engines showed no sign of power at impact and the left propeller was probably "feathered." Hall notes that though the blades of the propellers "were not in the feather-pitched

of the aircraft," resulting in "the least amount of drag." (Tr. at 55.)

3. In the Response to this Motion, Plaintiffs' counsel also argues that the magneto switches for the left engine were switched off. Hall, however, does not rely on the position of the magneto switches for his opinion, and even opines that "it doesn't look like the mags were shut off." (Dep. at 89.)

position when I observed it," "the prop was probably feathered because the damage is consistent with the prop not rotating." (Dep. at 42.) Defendant argues that this opinion lacks a factual foundation because the NTSB made no factual determination that the left engine quit, and because the left propeller was not in the feathered position when Hall inspected it. (Mot. at 11.) Defendant also observes that Hall did not dissemble the propeller. However, Hall, whose qualifications were not disputed, clearly states the basis for his findings, noting that while the prop was not in the feathered position, the damage to it was consistent with the prop being in the feathered position. This portion of the opinion has sufficient factual support.

■ Hall also opines that both engines show no signs of power at impact. With respect to the left engine, Hall bases his opinion that the left engine was not turning on the condition of the left propeller. Hall explains, "That's what the propeller evidence says, or if it was turning, it was turning very, very slowly." (Dep. at 43.) This opinion has a sufficient factual basis. In his deposition, Hall clarifies his opinion concerning the right engine, noting that though it showed no evidence of power on impact, "it was probably turning." (Dep. at 43.) He also notes that he has no reason to believe that the right engine was unable to develop power. (Dep. at 44.) In its Motion, Defendant does not challenge Hall's opinion of the right engine.

### 2. Design Defects in the Fuel System

Hall's second opinion is that the aircraft's fuel system is defective and unreasonably dangerous in six different ways: (a) the float valve design is such that it can easily develop leaks through the seat and that suction from the pump pulls on the seat in the opening direction; (b) the sump tank design is defective in that fuel can easily and quickly flow out of the sump tank area to the wing tip through the hat section stiffeners when the wing tip is low; (c) the flapper valves are poorly designed, and their failure is not detectable; (d) the gaskets on the fuel system are susceptible to leaks if not properly sealed and torqued; (e) the float valve design permits intermittent operation as the wear on

the valve increases; (f) the system has latent undetectable failure modes. (Mot. Ex. C at 7.)

Defendant makes two principal objections to Hall's testimony of these alleged defects: (1) his opinion that fuel can easily and quickly flow out of the sump tank area to the wingtip is based on an irrelevant test; and (2) there is no evidence indicating that these defects actually played a role in the accident. The first objection is the subject of a separate motion, Defendant's Motion in Limine to Exclude Plaintiffs' Mock-up of a T303 Wing. Because it is relevant here, this separate Motion will be addressed now.

#### a. Motion to Exclude Plaintiffs' Mock-up of a T303 Wing

■ In order to demonstrate that the fuel system of the Cessna T303 is defective, Hall performed a series of tests with a T303 wing. The test wing is an actual T303 wing, but the top wing skin and stiffeners have been removed and replaced with a piece of clear plastic so that observers may view the internal components of the wing. In the tests, Hall simulated the G-forces in an uncoordinated turn by placing the wing at various angles. In the first tests, Hall used 5–6 gallons of fuel, and in the second tests he used 35–40 gallons. The point of the tests is to view the movement of fuel in the wing that would occur during an uncoordinated turn. (Dep. at 34.)

■ "The trial court exercises a wide discretion in determining whether the probative value of tests and experiments exceeds the danger that such evidence may mislead the jury." d'*Hedouville v. Pioneer Hotel Co.*, 552 F.2d 886, 890 (9th Cir.1977). The Court's exercise of discretion depends in large part on the purpose for which the tests are used. If the experiment purports to simulate actual events, it will be admissible "if made under conditions which are substantially similar to those which are the subject of the litigation." *Four Corners Helicopters v. Turbomeca, S.A.*, 979 F.2d 1434, 1442 (10th Cir.1992). Substantial similarity does not require that the tests be identical to the actual event, only that they are sufficiently similar to provide a fair comparison. *Id.* On the

other hand, if the experiments are meant to demonstrate mechanical principles, they will be admitted only "upon a showing that the experiment was conducted under conditions that were at least similar to those which existed at the time of the accident." *Id.* (internal quotation omitted). If the experiment is admitted merely to show physical principles, the experiment should not suggest that it simulates actual events, and the jury should receive an appropriate instruction as to the limited purpose of the tests. *Id.*

In this case, it does not appear that Plaintiffs sought to simulate the actual accident. Plaintiffs observe,

> the point of the test was only to see if, at some point, during a specific flight condition the float valves could remain up (that is supported by fluid[)] whereas at the same time the ports through which the fluid or fuel was to flow would be exposed to air by virtue of the angle of the fluid within the intrical tank.

(Resp. at 4.) Hall also emphasizes that the test is merely "representative," and not a simulation. (Dep. at 34.) Moreover, this experiment is offered in support of Hall's second opinion, where he offers general comments and opinions about the design of the fuel system, not the condition of the accident aircraft. Hall does not opine that the defects actually played a role in the accident until the third opinion.

Defendant first objects that the demonstration is irrelevant and misleading because the "mock-up" does not function the same way as an actual aircraft. Specifically, Defendant argues that the unsealed top skin and missing support stringer cause fuel to flow within the wing in a matter that would not happen in an actual aircraft. (Mot. at 12.) Plaintiffs respond that

> the openings of the ribs where the stiffeners otherwise would be located has been sealed so that the openings left by the absence of spanwide stiffeners running along the top undersurface of the skin now presents the same circumstances with respect to how fuel can or cannot flow back and forth between the rib sections.

(Resp. at 3.) Defendants' second objection is that the tests themselves do not simulate actual flying conditions because tilting a non-moving wing does not duplicate the complex gravitational and centrifugal forces at work in a moving aircraft. (Mot. at 12.) Plaintiffs disagree, observing that "one can simulate the G-forces of an uncoordinated turn by simply computing the angle of gravity as a factor of the angle below the horizon of either wingtip," and that "at a constant forward velocity in an uncoordinated turn the vector of gravity remains exactly perpendicular to the earth because there is no centrifugal force or centripetal acceleration working on the object." (Resp. at 5.) Defendants' third objection is that the demonstration has no basis in the evidence. They argue that because Hall lacks direct evidence that the airplane was flown in an uncoordinated turn, he is unable to know vital statistics such as the degree of uncoordination, the duration of the turn, and the actual condition of the plane. According to Defendants, "these factors would have a substantial effect on the amount of lateral force affecting the fuel in the wing tanks." (Mot. at 13.)

However, because the tests do not purport to recreate the actual accident, they need only be conducted "under conditions that were at least similar to those which existed at the time of the accident." *Four Corners,* 979 F.2d at 1442. While the evidence does not reveal the exact angle and duration of the turn which was allegedly uncoordinated, Plaintiffs have offered evidence and explanations that the tests were at least similar to an uncoordinated turn.

The instant case presents similarities with *Nachtsheim v. Beech Aircraft Corp.,* 847 F.2d 1261 (7th Cir.1988). In *Nachtsheim,* the plaintiff alleged that an aircraft's design was unreasonably dangerous because it permitted ice to accumulate, thereby freezing the elevator. The manufacturer sought to introduce a videotape of a test flight performed in icy conditions, even though there were a number of significant differences between the accident aircraft and the test aircraft. The district court admitted the videotape, but limited its use for the purpose of illustrating how the plane functioned under icy conditions. *Id.* at 1278. On appeal, the Seventh Circuit found no abuse of discretion,

noting that it was relevant to the issue of whether the plane could be flown safely under these conditions, and there was no suggestion that the experiment simulated actual events. The court noted that alleged differences between the actual flight and the test flight "went to the weight of this evidence rather than to its admissibility." *Id.* Here, the tests of the T303 are offered not to recreate the accident, but rather to demonstrate that under some circumstances the float valves will not function as intended.

This scenario is also similar to *Champeau v. Fruehauf Corp.*, 814 F.2d 1271 (8th Cir. 1987). In *Champeau,* the plaintiff alleged that defectively designed brakes on a trailer caused his accident. The manufacturer was permitted to introduce a videotaped experiment performed at the scene of the accident tending to show that the brakes performed safely. In connection with this videotape, a list of differences between the actual accident and the experiment was read to the jury. On appeal, the court found no abuse of discretion, noting that "[t]he purpose of the experiment was not to recreate the accident, but to take Champeau's distance and speed estimates and show that under the applicable laws of physics the accident could not have occurred as Champeau had described." *Id.* at 1278. Likewise, so long as the tests are not used to simulate the accident itself, they are admissible.

Plaintiffs also propose to use the model used in the experiments "to show the jury what the construction of the intricacal fuel tank is like and exactly what defects Mr. Hall found therein." (Resp. at 4.) Defendant readily admits that the model consists of an actual T303 wing, though it objects to certain parts that were removed or altered in order to affix the plexiglass skin on the wing. Defendant's principal objection to these changes, however, concerns the way that these changes affected the fuel flow in the tests. The internal components, given that

they are part of an actual T303 wing, appear to be substantially similar to the actual plane, and may be of use in illustrating Plaintiffs' theory to the jury. Therefore, the test wing will also be admissible for the purpose of demonstrating to the jury any alleged defects that are otherwise admissible.

### b. Actual Presence of Defects

■ Defendant also objects to the admission of Hall's opinions regarding alleged defects on the ground that there is no evidence that these alleged defects played any role in the crash and because Hall did not perform any tests on the aircraft involved in the accident. Indeed, Hall does not opine that these defects were actually present in the aircraft, but rather that they "can easily" occur, that the fuel system is "susceptible to leaks," and that the design "permits intermittent operation." (Mot. at 14–17.) Defendant notes that because there is no direct evidence to demonstrate that the components identified by Hall actually malfunctioned, his opinions are mere speculation.

This dispute is closely related to the one presented in *McKendall,* in which the Ninth Circuit held that application of the factors articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), was limited to scientific testimony. 122 F.3d at 806. In *McKendall,* the court considered the admissibility of the expert opinion of an engineer in a products liability case. There, the district court had excluded his testimony as "conclusory assertions" because the plaintiffs failed to show that the modification proposed by the expert was feasible or that it would increase safety. *Id.* at 805. The Ninth Circuit reversed, holding that exclusion of the testimony was improper because the expert's opinions were " 'facially helpful and relevant' and seemingly reliable." *Id.* at 807 (quoting *Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1519 (10th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996)).[4]

---

4. Although this test appears to be in conflict with Fed.R.Evid. 702, as interpreted by *Daubert,* which requires that the experts' opinion be "reliable" and that trial judges carefully scrutinize the expert's opinion, it is the most recent Ninth Circuit opinion concerning the application of Rule 702 and *Daubert* to nonscientific testimony.

*McKendall,* 122 F.3d at 806 n. 1 (noting the Circuit's "conflicting pronouncements" on the issue). In *Daubert,* the Supreme Court held that "under the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, *but reliable."* 509 U.S. at 589 (emphasis added). In

The court explained that even though the expert had not created or tested the safety device that he proposed, his background in engineering and in investigating similar accidents was a sufficient basis for the testimony. Similarly, in *Compton,* which was approvingly quoted in *McKendall,* the court admitted expert testimony that was based on "general engineering principles" and "twenty-two years of experience as an automotive engineer." 82 F.3d at 1513.

In this case, Hall bases his opinions regarding the alleged defects in the fuel system on the "the facts of the accident," the reports of the accident by various agencies, his examination of the actual wreckage and photos, and his examination of the fuel system design. Combined with Hall's relevant expertise, which Defendants do not challenge, Hall's testimony has a reliable foundation. Accordingly, Hall's opinions concerning alleged defects are admissible.

### 3. Engine Lost Power and Was Shut Down by the Pilot

 Hall's third opinion is that the left engine lost power and was shut down by the pilot while in a traffic pattern, "most probably" from ingestion of air during an uncoordinated turn. This opinion is premised on a series of conclusions arising from the first and second opinions. In his first opinion, Hall opined that the left engine was not running at impact and that the left propeller was in the feathered position. Here, in his third opinion, Hall concludes that the only explanation for these two events is that the pilot had shut the engine down. (Dep.46–47, 83.) He further reasons that the pilot would not have done so unless there was a malfunction, and that the "most probable" cause of the malfunction was fuel starvation. (Dep. at 47, 60.) Hall finally concludes that the fuel

starvation occurred in an uncoordinated turn. (Dep. at 60.)

Defendant objects to this opinion because Hall never tested this theory in flight and he does not know exactly how the engine behaves when air is introduced into the fuel system. Defendant also notes that Hall never inspected the engines of the aircraft, and that he bases his opinion that the left engine was not producing power solely on the condition of the propellers.

Hall's initial step, that the pilot shut down the engine, has a solid factual basis. To arrive at this conclusion, Hall points to his prior determinations that the left engine had no power on impact and that the left propeller was feathered. He also notes that both Defendant and the NTSB could not find any explanation for the lack of engine power. (Dep. at 40.) His next step is that the pilot would not have shut down the engine in the absence of a malfunction. This conclusion follows naturally from the prior conclusion. The final step in Hall's theory is that the malfunction arose from fuel starvation while in an uncoordinated turn. For this particular opinion, Hall relies on his analysis of the defects in the fuel system. (Dep. at 47.) He considers this explanation to be "the most probable" because there were no other potential problems identified by other investigators, including Defendant and the NTSB. (Dep. at 39–41.) He also considers the possibility of debris clogging one of the float valves, but discounts that possibility because the other float valve should have provided sufficient fuel. (Dep. at 40.) Given Hall's consideration of other causes and his unchallenged qualification to make these types of expert opinions, this opinion "rests on a reliable foundation and is relevant to the facts of the case." *McKendall,* 122 F.3d at 806.

*Daubert,* the Court also observed that the relaxation of the usual requirement firsthand knowledge for expert witnesses represents "the common law insistence upon the most reliable sources of information," which is premised on the assumption that the expert's opinion will have "a reliable basis in the knowledge and experience of his discipline." *Id.* at 592 (internal quotations omitted).

The motion here is decided on less rigid standards than used for resolving a motion for sum-

mary judgment. Significantly, the Supreme Court in *Daubert* indicated that even if expert opinion or evidence is relevant and admissible, if "insufficient to allow a reasonable juror to conclude that the position more likely to than not is true," it may be basis for a directed verdict or a grant of summary judgment. *Id.* at 596. This is not to suggest that this Court would grant a summary judgment here, but only to call attention to the different analysis on summary judgment and a motion in limine.

#### 4. The Crash Was Caused by the Alleged Design Defect

■ Hall's fourth and concluding opinion is that the accident was caused by the defective design of the fuel system, which resulted in the failure of the left engine and a lateral load imbalance. (Mot. at Ex. D.) Defendant argues that Hall has no support for this opinion, noting that Hall admits that the plane can be flown on one engine, and that the failure or shutdown of the left engine does not necessarily cause a crash when the right engine is operating. (Dep. at 84.) Plaintiffs respond that the airplane's capacity to fly on one engine "simply does not answer the question as to whether or not a defect in the design of the airplane set in motion the events which caused the crash (or which was a contributing cause)." (Resp. at 5.) Plaintiffs suggest that the failure of the left engine may have produced a counterclockwise rotation, causing it to spin out of control. *Id.*

The support for this argument, however, is not provided by Hall. In his deposition, he provides no explanation. When questioned about the consequences of shutting one engine down, he answers, "It is not a given that a twin engine airplane will crash when one engine is shut down, that's correct." (Dep. at 84.) When questioned about whether the aircraft entered a spin, he responds, "That's an area that I haven't really tried to answer, because that's not my area." (Dep. at 97.) With respect to his final opinion, Hall does not articulate his reasoning, as he has done with his previous opinions, and he fails to provide a satisfactory explanation. In short, Hall's concluding opinion lacks factual support and it will be excluded.

### B. Jeurgen Janzik

■ Janzik is a pilot expert for the Plaintiffs, and he will offer the following opinions: (1) the pilot followed the required preflight procedures; (2) the "downward pattern" was conducted using standard traffic pattern procedures; (2) "the turn to base leg appears to be much tighter than normal and indicates a set and dramatic loss of air speed." (Motion at 24, Ex. E at 2.) Defendant does not question Janzik's qualifications or the foundation for his opinions, but rather points out that

they do not address certain issues, such as whether the plane was defective, why the accident occurred, and why the plane could not operate on one engine. These observations do not demonstrate that the proposed testimony lacks a factual basis, and these opinions are admissible.

At oral argument, counsel for Plaintiffs also pointed to Janzik's deposition testimony to support the proposition that operating the aircraft is more difficult when one engine fails, thus providing a causal link between the failure of the left engine and crash. According to Plaintiffs' counsel, "Janzik says in his deposition, among other things, that at the point that this all happened, the pilot had his hands full and I'm sure was confronted with more than he could cope with, or words to that effect." (Tr. at 78.) In his deposition, Janzik and counsel for Defendant had the following exchange:

A: He would—he is trained to land the airplane in a single-engine configuration if the airplane is flying on one engine.

Q: You use the amount of power on the remaining engine necessary to get to the airport at the appropriate speeds?

A: If you can, yes.

Q: Well, you don't need full power on the right engine, for example, if the left engine failed. You don't need full power on the right engine to get to the airport from a mile and three-quarters away and 1,100 feet above the ground, do you?

A: We do—no.

Q: That's right.

A: We do not know what happened between 10 and the crash site. We do not know what were the distractions that this pilot had. Mind you, it's also nighttime. So he's a 550-hour pilot. His hands are full to maintain even a proper flight envelope under normal conditions.

(Dep. at 35–36.) This testimony, however, does not directly address the difficulty of controlling a multi-engine plane when one engine has failed. Rather, Janzik appears to be discussing the various factors that could have distracted the pilot, such as the time of day and his relatively low level of experience. Moreover, Janzik specifically states that he

will not offer any opinions on the spin characteristics of the aircraft. (Dep. at 76.) Neither Janzik's disclosed opinions nor his deposition testimony appear to support the proposition that operating the aircraft on only one engine was necessarily difficult.

## C. Kenneth Orloff

 Orloff is another of Plaintiffs' experts, and he intends to offer the following opinions about the airplane's flight path and speed: (1) the "airplane was not established on a final approach aligned with the center line of runway 21L at the time of the crash;" (2) the "airplane impacted the ground in a nearly flat pitch attitude, with a right bank angle, at a high rate of descent with a significant left side slip, and little, if any, forward motion;" (3) at impact, the left engine was not producing power and the left propeller was not rotating; (4) at impact, the right engine was producing power and the right propeller was rotating; and (5) the airplane impacted "in a manner consistent with the dynamics of a single 'flat spin angle.'" (Mot. at Ex. G.) As with Janzik, Defendant does not question Orloff's qualifications or the foundation for his opinions, but rather points out that they do not address certain issues, such as whether the plane was defective, why the accident occurred, and why the plane could not operate on one engine. These observations do not demonstrate that the proposed testimony is lacking in factual support. Accordingly, these opinions are admissible.

In addition to these specific opinions, Plaintiffs suggest that Ken Orloff will provide testimony relating to causation. In the Response to Defendant's Motion to Exclude the T303 Wing, Plaintiffs note that "in a situation where there is an engine failure on one engine at a critical speed the aircraft will roll into a spin and thus become uncontrollable." (Resp. at 2.) There, Plaintiffs observe that this subject "has been addressed by Plaintiffs' expert, Ken Orloff," as well as by defense experts. (Resp. at 2–3.) Orloff, however, bases his opinion that the aircraft entered a flat spin on the way it impacted the ground, and he offers no opinion regarding the relationship between engine failure and spinning. In his deposition, Orloff was asked

if he had any data indicating that the aircraft will flat spin, and he replied, "Other than that's the way that it appears to have impacted the ground, no." (Dep. at 45.) He also states that he relied only on wreckage distribution, the condition of the wreckage, and the impact attitude to render this opinion. (Dep. at 47.)

## IV. THEORY OF CAUSATION

 Drawing on its arguments relating to all three proposed experts, Defendant argues that because Hall cannot explain how the accident occurred after the left engine failed, and because neither of the other two experts offer causation testimony, their testimony is of no value in explaining the cause of the crash and should be excluded. (Mot. at 31.) Defendant argues that expert testimony is properly excluded if the expert fails to rule out other possible causes for the accident, and in support of that proposition cites *Claar v. Burlington Northern Railroad Co.*, 29 F.3d 499, 502 (9th Cir.1994) and *Diviero v. Uniroyal Goodrich Tire Co.*, 919 F.Supp. 1353, 1358–60 (D.Ariz.1996). Each of these cases, however, is distinguishable from the instant case. In *Claar*, the court applied the *Daubert* factors and determined that the opinions of the proposed experts were not derived using the scientific method, as required by *Daubert*. In this case, nonscientific testimony is at issue and according to recent Ninth Circuit authority, *Daubert* does not apply. The Court's inquiry is therefore less stringent. While the *Claar* court noted that *Daubert*'s requirements "apply to all proffered expert testimony," 29 F.3d at 501 n. 2, the Ninth Circuit has held this pronouncement to be dicta. *McKendall*, 122 F.3d at 806 n. 1. Thus, Plaintiffs need not show that the expert testimony is derived by the scientific method, which is based on "generating hypotheses and testing them to see if they can be falsified." *Daubert*, 509 U.S. at 593.

 As a result, *"Daubert*'s tests for the admissibility of expert scientific testimony do not require exclusion of expert testimony that involves specialized knowledge rather than scientific theory." *United States v. Big-*

*head,* 128 F.3d 1329, 1330 (9th Cir.1997). Instead, the inquiry is whether the expert's testimony is "facially helpful and relevant and seemingly reliable." *McKendall,* 122 F.3d at 807. The testimony of Plaintiffs' three experts, though they do not offer an opinion that the loss of power in the left engine caused the plane to enter the "flat spin," may be "facially helpful" to the factfinder in evaluating Plaintiffs' theory of causation.

In *Diviero,* this Court excluded the testimony of a proposed expert because it was not helpful to the trier of fact, as required by Rule 702.[5] In that case, the expert opined that a tire that had separated was defective. As this Court noted, "He offered no reasonable explanation why he concluded that there was a defect, just that because of his vast experience with examining tires it must be defective because he has no other explanation for the separation." 919 F.Supp. at 1360. In the instant case, with the exception of Hall's concluding opinion, Plaintiffs' experts offered detailed explanations for their opinions. The testimony in this case, with the one exception, has been supported by specific facts. *Diviero,* therefore, is inapposite.

Still, because Hall's concluding opinion lacks factual support, none of the three experts whose testimony is at issue in this case offer admissible opinions that explain the link between the failure of the left engine and the "flat spin" which the airplane allegedly entered and from which it could not escape. Despite this gap, the Court cannot grant Defendant's motion to exclude the testimony. The operative standard is that recently set forth by the Ninth Circuit in *McKendall.* So long as the expert opinions are "facially helpful and relevant and seemingly reliable," the Court must admit them. 122 F.3d at 807. With the exception of Hall's final opinion, the opinions proffered by Plaintiffs' three ex-

perts meet this test, and they would be helpful to the trier of fact in evaluating Plaintiffs' theory of the crash. Defendant "will have every opportunity on cross-examination" to point out the weaknesses in these experts' testimony. *Id.* Because this question arises in the context of a motion in limine, rather than a motion for summary judgment, the Court's inquiry is limited to reliability and relevance, not whether there exists a genuine issue of material fact with respect to causation.[6]

Accordingly,

**IT IS ORDERED** granting in part and denying in part Defendant's Motion to Exclude the Testimony of Plaintiffs' Experts (doc. # 78). The Motion will be denied with the exception of David Hall's concluding opinion on causation.

**FURTHER ORDERED** denying Defendant's Motion in Limine to Exclude Plaintiffs' Mock-up of a T303 Wing (doc. # 75).

---

**5.** In *Diviero,* this Court concluded that the expert testimony concerned a "complex scientific process." 919 F.Supp. at 1357. In affirming this decision, the Ninth Circuit held that the testimony was speculative and inadmissible under Rule 702, and did not reach the issues of whether the testimony was scientific or technical, or whether *Daubert* applied. 114 F.3d 851, 853 (9th Cir. 1997).

**6.** It should be noted that Plaintiffs point to other evidence that may be relevant on the issue of causation. For example, the deposition testimony of Thomas Wallis, a test pilot formerly employed by Defendant, may support an inference that the failure of an engine increases the probability of a pilot losing control of the T303. (Dep. at 14–16.) Here, however, the Court considers only the admissibility of the opinions of Hall, Janzik, and Orloff.